## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
**METSO AUTOMATION USA, INC.,**                )
                                                                     )
            **Plaintiff,**                                        )
                                                                     )          **Civil Action No.**
**v.**                                                               )          **11-10514-FDS**
                                                                     )
**ITT CORPORATION,**                                )
                                                                     )
            **Defendant.**                                     )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

This is a dispute concerning an indemnification agreement.  Plaintiff Metso Automation USA, Inc. and defendant ITT Corporation each seek contractual indemnification from the other for damages incurred defending asbestos-related product-liability suits.  The parties both rely on an indemnity clause contained in an agreement executed in 1983 between their predecessors-in-interest.

ITT has moved for partial summary judgment.  For the following reasons, and in lieu of granting partial summary judgment to ITT, plaintiff will be given an opportunity to file a response under Fed. R. Civ. P. 56(d).  The Court will also give the parties an opportunity to file supplemental memoranda on the issue of whether the Court's earlier ruling granting partial summary judgment as to the declaratory judgment claim should be vacated.[1]

## I.        Background

ITT is the successor-in-interest to ITT-Grinnell Valve Co., Inc.  (Def. SMF ¶ 1).  From

---

[1] ITT has also moved to strike the *Mahar* interrogatory answers.  For the reasons set forth below, that motion will be denied.

1958 to 1984, ITT-Grinnell manufactured valves under the name "Hammel Dahl."  (*Id.*).  At

least some of those valves may have contained asbestos.

Pursuant to an agreement dated December 15, 1983 (the "1983 Agreement"),

ITT-Grinnell sold its Hammel Dahl assets to Hammel Dahl, Inc., a Rhode Island corporation.

(Def. SMF ¶ 2).  The transaction closed on January 26, 1984.  (*Id.*).

Article IV of the 1983 Agreement apportioned liability between Hammel Dahl and ITT-

Grinnell for product liability claims.  Specifically, § 4.1 states in relevant part:

> The Purchaser shall, by an instrument to be executed and delivered at the Closing
> . . . agree to perform, pay or discharge, to the extent not theretofore performed,
> paid or discharged, the following liabilities and obligations of the Seller:
>
> * * *
>
> (c) Liabilities of the Seller on account of any product liability claim with respect
> to products of the Division shipped after the Closing Date, *provided, however,*
> *that all products, regardless of their actual date of shipment, shall be presumed to*
> *have been shipped after the Closing Date unless the Purchaser can show that a*
> *particular product was shipped prior to the Closing Date* . . . .  The Purchaser
> further agrees that, upon request of the Seller, the Purchaser will fully cooperate
> with and assist the Seller in defending any product liability claims that may be
> brought against Seller, provided, however, that the Seller shall reimburse the
> Purchaser for any expenses (Including salaries and travel expenses of its
> employees) incurred by the Purchaser in providing such assistance.
>
> Except as expressly provided in this Section 4.1, the Purchaser shall not be
> obligated to assume or become liable for any of the Seller's liabilities,
> obligations, debts, contracts or other commitments of any kind whatsoever,
> known or unknown, fixed or contingent.

(Def. SMF, Ex. A) (emphasis added).  Sections 4.2 and 4.3 defined the parties' indemnification

rights under the agreement.  Section 4.2 states in relevant part:

> The Seller shall indemnify the Purchaser against and hold it harmless from any and
> all liabilities in respect of suits, proceedings, demands, judgments, damages,
> expenses and costs (including, without limitation, reasonable counsel fees) which
> the Purchaser may suffer or incur by reason of (i) the Seller's failure to pay,

2

discharge or perform any of its liabilities or obligations which are not expressly assumed by the Purchaser under this Agreement . . . .

(Def. SMF, Ex. A).  Section 4.3 states:

> The Purchaser shall indemnify the Seller against and hold it harmless from any and all liabilities in respect of suits, proceedings, demands, judgments, damages, expenses and costs (including, without limitation, reasonable counsel fees) which the Seller may suffer or incur by reason of (i) the Purchaser's failure to pay, discharge or perform any of its liabilities or obligations which are expressly assumed by the Purchaser under this Agreement; and (ii) breaches of or inaccuracies in the covenants, representations and warranties made by the Purchaser in this Agreement.

(Def. SMF, Ex. A).

Metso is Hammel Dahl, Inc.'s successor-in-interest under the agreement.  (Def. SMF ¶ 6).  In 2002, Metso sold all Hammel Dahl assets to KOSO America, Inc.  As part of that sale, Metso agreed to indemnify KOSO for product liability claims.

As of the date of this lawsuit, KOSO has been named as a defendant in ten lawsuits involving claims of personal injury resulting from exposure to asbestos-containing Hammel Dahl valves.  Metso has defended KOSO in those lawsuits.  As of April 5, 2013, ITT has been named as a defendant in at least 76 lawsuits involving similar personal-injury claims.

ITT seeks partial summary judgment as to its potential liabilities arising out of four state-court product liability actions alleging asbestos-related injuries caused by Hammel Dahl products.  The four actions, which ITT contends are representative of various types of claims, are as follows:

*Mahar, et al., v. Allis-Chalmers Corp. Prod. Liab. Trust, et al.*, No. CGC 07-274434 (Cal. Super. Ct.);

*Sumner, et al., v. American Blower Co., et al.*, No. N11C-04-024 ASB (Del. Super. Ct.);

3

*Moore, et al., v. A.O. Smith Corp., et al.*, No. 11-C-835 KAN (W. Va. Cir. Ct.); and

*Livingston v. 3M Co., et al.*, No. 10-C-1534 (W. Va. Cir. Ct.).

## II.  Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  In evaluating a summary judgment motion, the Court indulges all reasonable inferences in favor of the non-moving party.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.  Analysis

ITT seeks summary judgment on all indemnification claims involved in four "exemplar actions."  The four actions typify four categories of cases in which the parties dispute their respective indemnification obligations.  Those categories, as presented by ITT, are:

(1) *"Mahar"* cases:  cases in which Metso seeks indemnification by ITT, and the complaint in the underlying product liability case alleges exposure that extends beyond the closing date;

(2) *"Sumner"* cases:  cases in which Metso seeks indemnification by ITT, and the complaint in the underlying product liability case alleges exposure that ended before the closing date;

(3) *"Moore"* cases:  cases in which ITT seeks indemnification by Metso, and the complaint in the underlying product liability case alleges exposure that extends beyond the closing date; and

(4) *"Livingston"* cases: cases in which ITT seeks indemnification by Metso, and the complaint in the underlying product liability case alleges exposure that ended before the closing date.

(Def. Br. at 2-3).

ITT's motion is based on Section 4.1 of the asset purchase agreement.  That section provides that Metso is responsible for "[l]iabilities . . . on account of any product liability claim with respect to products of the [Hammel Dahl division] shipped after the closing date."  The agreement further provides that "all products, regardless of their actual date of shipment, shall be presumed to have been shipped after the [c]losing [d]ate unless the [p]urchaser can show that a particular product was shipped prior to the [c]losing [d]ate."  (Def. SMF, Ex. A).  Under Section 4.2, if Metso's predecessor assumed liability for a claim under the agreement, then Metso is required to indemnify ITT against the costs of defending any such claim.

The success of ITT's motion turns principally on the question of what type of evidence Metso must produce to "show," for purposes of the agreement, that a product was shipped prior to the closing date, and the impact of the contractually-specified presumption. Metso contends that it is sufficient, for purposes of the contract, for it to come forward with a complaint or interrogatory answer from the underlying product liability lawsuit that shows that the plaintiff's

*claim* is based on allegations of exposure that precede the closing date.  As noted, ITT contends

that Metso must make the requisite showing with *evidence* that would be admissible at trial;

because both complaints and interrogatory answers are typically inadmissible hearsay, ITT

contends that they are insufficient for that purpose.

      A.       **The Meaning of the Contract**

Section 16.10 of the 1983 Agreement states that the agreement will be governed by the

laws of Rhode Island.  (Def. SMF, Ex. A).  Under Rhode Island law, a court's primary task in

interpreting a contract is to "ascertain the intent of the parties."  *D.T.P., Inc. v. Red Bridge

Properties, Inc.*, 576 A.2d 1377, 1381 (R.I. 1990).  Where possible, the Court should infer the

parties' intentions from the terms of the contract, giving those terms "their plain, ordinary, and

usual meaning."  *Johnson v. Western Nat'l Life Ins. Co.*, 641 A.2d 47, 48 (R.I. 1994) (citing

*Sentry Insurance Co. v. Grenga*, 556 A.2d 998, 999 (R.I. 1989)).

Here, the contract itself does not specify the nature of the proof the parties intended for

Metso to produce in order to "show" that a product was shipped prior to the closing date.  ITT

contends that the Court should interpret the contractual language as requiring Metso to make the

requisite showing with evidence that would be admissible in court pursuant to the Federal Rules

of Evidence.  ITT contends that the word "show" has a commonly understood meaning in the

legal context:  to set forth admissible evidence that establishes, by a preponderance of the

evidence, that a certain proposition is true.

Under Rhode Island law, however, "an undefined term in a contract should not carry a

technical or otherwise extraordinary meaning."  *Garden City Treatment Center, Inc. v.

Coordinated Health Partners, Inc.*, 852 A.2d 535, 542 (R.I. 2004).  That principle has been

applied to words that could be interpreted as technical legal terms.  For example, the Rhode Island Supreme Court has interpreted the word "appeal" in the labor arbitration context to include not only direct appeals in the formal sense of the term, but also motions to vacate.  *See City of East Providence v. United Steelworkers of America, Local 15509*, 925 A.2d 246, 253 (R.I. 2007) ("Based on the plain, ordinary, and common meaning of 'appeal,' we conclude that in the statutorily constructed confines of labor arbitration, a motion to vacate is the functional equivalent of an appeal.").

ITT's interpretation of the word "show" would impose technical requirements on the level of proof necessary to make a showing under the contract.  That interpretation does not appear to accord with Rhode Island law.  The Court will therefore look to the ordinary meaning of the word "show," instead of a strict legal or technical definition, in order to interpret the contract.

Given the context of the contract, the most apt definition of the word "show" is "to make evident by logical procedure; explain or prove [to *show* that something is right]."  WEBSTER'S NEW WORLD DICTIONARY 1243 (3d ed. 1988).  In ordinary business dealings, showing that a fact is true does not typically require formal evidence of a nature sufficient to be admitted in a court of law.  For example, one person could agree to pay another five hundred dollars to deliver a package from Boston to a person in Los Angeles.  The deliverer could subsequently "show" she delivered the package by producing an unauthenticated receipt, purporting to be signed by the recipient.  That would surely be sufficient proof in most business dealings; it would not, however, strictly satisfy the Federal Rules of Evidence, and therefore would be insufficient under the interpretation proposed by ITT.

7

Here, one of the ways that Metso might try to prove that a valve was shipped prior to the closing date is by producing an actual invoice with a shipment date. Such proof would likely be sufficient to satisfy a reasonable business person as to the date of shipment. But if Metso could not produce a person to authenticate the invoice, or to show that it was a record of a regularly conducted business activity or an ancient document, the invoice might not be admissible. *See* Fed. R. Evid. 901(a), 803(6)(D), 803(16). Again, such a narrow or technical definition should not be read into the contract, absent some indication that parties intended to do so.

In short, the Court finds that the parties' intent in drafting the agreement was not to require formal proof for plaintiff to "show" the date that a particular product was shipped.[2] Rather, Metso can "show" the date of shipment by offering proof that a reasonable person would accept under the circumstances.[3]

A related question is the meaning of the term "presumed" in the agreement ("all products . . . shall be presumed to have been shipped after the [c]losing [d]ate unless the purchaser can show that a particular product was shipped prior to the [c]losing [d]ate"). The word "presumption" can have a technical legal meaning; the term normally applies to a rule "calling for a certain result in a given case unless the adversely affected party overcomes it with

---

[2] ITT points out that the Court previously stated that Metso could "demonstrate that a claimant was injured by a particular product that was shipped before the closing date by any form of evidence reasonably sufficient to prove that proposition." *Metso Automation USA, Inc. v. ITT Corp.*, No. 11-10514, Docket No. 29 at 9 (D. Mass. Aug. 13, 2010). The Court at the time did not specifically discuss the formality of proof required to defeat the presumption in the contract, and the use of the word "evidence" there was not intended to limit plaintiff strictly to formal proof.

[3] That interpretation is buttressed by the way courts typically handle missing terms in contracts. "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1984). Here, the level of formality of the proof needed to "show" the products were shipped before 1983 is analogous to a missing term that must be supplied by the court.

other evidence." BRYAN A. GARNER, BLACK'S LAW DICTIONARY (8TH ED. 2004) at 1223.  Some

presumptions shift the burden of production (that is, the presumption disappears if the opposing

party comes forward with a certain quantum of evidence) whereas others shift the burden of

persuasion (that is, the opposing party must prove the contrary proposition, in civil cases, by a

preponderance of the evidence).  *See id.*

However, the term "presumed" also has an ordinary meaning:  "to suppose to be true in

the absence of proof."  *See id.*  Again, the contract will be interpreted using the plain and

ordinary meaning of the term.  Under common usage, a presumption can be overcome by

"proof," not by the mere production of some amount of "evidence" (in other words, in common

usage, a presumption creates a burden of persuasion, not a burden of production).  Here, the

contract creates a presumption of a later shipment.  That presumption can be overcome by a

showing (that is, reasonable proof) of an earlier shipment.  The presumption does not disappear

simply because *some* evidence is brought forward; the evidence must be sufficient to make the

necessary "showing."

The Court turns next to the application of those interpretations in the present context.  At

the risk of stating the obvious, personal injury lawsuits based on claims of product liability often

involve disputes concerning the identity of the manufacturer of the allegedly defective product.

That is particularly true in cases claiming asbestos exposure, which often involve claims of

exposure to multiple products over many years.[4]  Even when the wrong manufacturer is sued,

that fact may not become apparent in the litigation for some time, and the evidence identifying

the manufacturer may be uncertain, contradictory, or otherwise subject to doubt.  Product

---

[4] Metso notes, and ITT does not dispute, that by 1983 "[a]sbestos litigation was . . . in full flower."  Pl. Opp. at 2 n.2.

liability claims must nonetheless be defended (which may involve significant expense) and frequently settle before all issues (including product identification issues) have been finally resolved.

All of those facts were undoubtedly known to the contracting parties.  Indeed, the contract clearly contemplates the possibility that the identity of the manufacturer of an allegedly defective valve may be in doubt.  The parties might have elected to allocate the risk and expense of litigation in a variety of ways; they might, for example, have provided that the obligation to defend a claim, and pay any judgment, would fall on the party whose product was *claimed* to have caused the injury, subject to a showing that the other party's product in fact was *in fact* the cause.  Such an arrangement would have been perfectly sensible.[5]  But that is not what the contract says.  Instead, it effectively places the full burden on the buyer (Metso) unless it can be "shown" is that "a particular product was shipped prior to the [c]losing [d]ate."  And mere proof that a particular plaintiff has made a *claim* (such as proof of the filing of a complaint) would not normally be sufficient to make the necessary *showing* of a shipment date.  Other types of proof—such as invoices, shipment records, or eyewitness testimony—would be necessary. Whether a particular type or quantum of evidence is sufficient would, of course, depend on all the circumstances; it is entirely possible that a hearsay statement (such as an interrogatory answer) might suffice in some circumstances.  But a mere allegation, or a mere claim, is not

---

[5] Insurance contracts usually contain two obligations:  a duty to defend and a duty to indemnify.  *Travelers Cas. and Sur. Co. v. Providence Washington Ins. Co., Inc.*, 685 F.3d 22, 25 (1st Cir. 2012) (citing *Mellow v. Medical Malpractice Joint Underwriting Ass'n of Rhode Island*, 567 A.2d 367, 368 (R.I. 1989) (per curiam)).  The duty to defend requires the insurer to litigate the matter in court, and normally arises if "the pleadings recite facts bringing the injury complained of within the coverage of the insurance policy."  *Peerless Inc. Co. v. Viegas*, 667 A.2d 785, 787 (R.I. 1995) (internal quotations omitted).  The duty to indemnify requires the insurer to pay liabilities the insured incurs and arises if the facts of the case give rise to coverage under the policy.  *See Travelers Cas. and Sur. Co.*, 685 F.3d at 25.

enough.

In sum, the contract places the burden of paying for all obligations "on account of any product liability claim" on Metso, unless a very specific event occurs:  a showing that a particular product was shipped on an earlier date.[6]   Metso argues that such a construction would discourage settlements, arguing that it "would have every incentive to try cases rather than settle them, at least where the evidence available appeared to implicate a pre-closing valve."  (Pl. Opp. at 2).  The short answer to that argument is simply that the parties agreed to such an arrangement, regardless of its potential consequences.  Furthermore, and in any event, it does not appear that the incentives of the parties to settle cases are materially changed by such a construction.  As in any case, Metso has an incentive to settle when its liability is reasonably clear, and an incentive to litigate when it is not.  And if the evidence available appeared to implicate a valve manufactured prior to the closing date, Metso could make demand on ITT under the contract;  ITT would decline to accept responsibility at its peril.

With that framework in mind, the Court will analyze the motion for summary judgment.[7]

---

[6] The contract does not indicate the appropriate way to allocate responsibility when a plaintiff is injured by valves manufactured both before and after the closing date.  Presumably, both parties would be jointly and severally liable for such a claim.  *See Hawkins v. Gadoury*, 713 A.2d 799, 802-03 (R.I. 1998) (describing joint and several liability).

[7] The parties have not briefed, and have not asked the Court to decide, a number of potential subsidiary issues.  For example, the parties have not addressed whether there are any circumstances under which the contract imposes a duty to defend, as opposed to a duty to indemnify.  *See, e.g., A.F. Lusi Const., Inc. v. Peerless Ins. Co.*, 847 A.2d 254, 260-61 (R.I. 2004) ("A contractual duty to 'indemnify and hold harmless' is not the legal equivalent of a duty to procure insurance coverage for that indemnity obligation."); *Northern Ins. Co. of New York v. Point Judith Marina*, LLC, 579 F.3d 61, 72 n.9 (1st Cir. 2009) (finding that indemnity clause in a Rhode Island contract did not imply duty to defend because that clause did not turn indemnifying party into an insurer); *see also Saint Paul United Methodist Church v. Gulf States Conference Ass'n of Seventh-Day Adventists, Inc.*, 2013 WL 2453719, at *3, n.3 (M.D. Ala. June 5, 2013) (collecting cases from several states and finding no decision that implies a duty to defend based on a contract provision requiring only a duty to indemnify).  Nor have the parties addressed the circumstances, if any, under which either party must indemnify the other for legal expenses incurred in defending against a claim.

B.      **Whether Summary Judgment May Issue**

ITT seeks partial summary judgment as to any obligations arising out of the four

identified underlying lawsuits on the grounds that "Metso can neither prevail on its own claims

for indemnification for *Mahar* and *Sumner*, nor defeat summary judgment as to ITT's claims for

indemnification for *Moore* and *Livingston*." (Def. Mem. at 7).

1.      **Metso's Claims for Indemnity**

In the first set of cases, Metso seeks indemnification from ITT.  ITT contends, correctly,

that Metso cannot simply point to the claims in a complaint alleging asbestos exposure to a

Hammel Dahl valve in order to shift the liability to ITT.  It is true that mere allegations are not

enough to make the "showing" of earlier shipment required by the contract.  But it does not

follow that Metso could *never* make that showing; presumably, at least some portion of the

underlying litigation is still in the discovery phase, and it is unclear what proof of exposure will

ultimately emerge from that process.

As to the *Mahar* case, Metso has submitted interrogatory responses suggesting that the

plaintiff was exposed to valves manufactured before the contract closing date.  Those responses

are, in fact, hearsay; nonetheless, they may be sufficient to make the showing required under the

contract, and ITT has submitted no contrary evidence.  As to that case, therefore, summary

judgment for ITT would appear to be inappropriate, and should be denied.  ITT's motion to

strike those answers will also be denied.  As to the *Sumner* case, Metso has not put forth

evidence that ITT has breached the contract.  Summary judgment for ITT would ordinarily be

appropriate as to that claim.

However, this case is in a somewhat unique posture.  In an ordinary civil case, the parties

12

have the opportunity to take discovery as to the relevant issues upon which liability depends.  In this case, however, the development of the facts must occur in the state court case in Delaware, not this one.  Granting summary judgment to ITT on such a claim now, if that discovery is not complete, might be premature and unfair to Metso.

The Federal Rules of Civil Procedure provide a method for addressing situations where summary judgment cannot be granted because the factual development of the case is incomplete.  Under Rule 56(d), a motion for summary judgment can be deferred  if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  In light of the Court's ruling in this memorandum, and rather than simply granting summary judgment for ITT at the present time, Metso will be given an opportunity to file a Rule 56(d) response.  If Metso is able to establish that further factual development is necessary and appropriate, the Court will consider denying the motion for summary judgment without prejudice to its renewal.  The Court will defer ruling on the summary judgment motion as to the *Mahar* case for the present, and will take the matter up once the issues have been resolved in the other three cases.

2.      <b><u>ITT's Claims for Indemnity</u></b>

The second set of cases involves ITT's claims for indemnity against Metso.  ITT has demanded indemnification in the *Moore* and *Livingston* cases, in which plaintiffs have brought suit against ITT claiming exposure to asbestos from Hammel Dahl products.  Again, there is no evidence before this Court that Metso has made any showing that the relevant products were shipped after the closing date.  Again, however, it appears that both cases are ongoing, and the state of factual proof may change over time.  The Court will therefore give Metso an opportunity

13

to file a Rule 56(d) response rather than simply granting summary judgment for ITT at this time.

### C.      Claim for Declaratory Judgment

On August 14, 2012, the Court granted summary judgment to ITT on Metso's declaratory judgment claim.  It appeared at the time that the declaratory judgment claim was merely duplicative of the breach of contract claim, because that claim sought resolution of legal issues that would necessarily be resolved by the breach-of-contract claim.  In light of the present ruling, however, it is at least possible that a separate declaratory judgment might in fact serve a useful purpose; among other things, it may be in the interests of the parties to have the Court enter a declaratory judgment as to the contract as a general matter, and dismiss the specific claims for breach of contract based on individual product liability claims, without prejudice to their renewal.  Among other things, this would permit an appeal of the Court's interpretation of the contract without unnecessary delay and expense.  Accordingly, the parties will be given an opportunity to brief the issue of whether the Court's order of August 13, 2012, granting summary judgment as to the declaratory judgment count should be vacated.

### IV.      Conclusion

For the foregoing reasons,

1.      Plaintiff may submit a response to ITT's motion for partial summary judgment under Rule 56(d) of the Federal Rules of Civil Procedure no later than December 20, 2013.  If plaintiff does not file such a response by that date, defendant's motion for partial summary judgment will be granted as to *Sumner*, *Moore*, and *Livingston* cases, and denied as to the *Mahar* case.

2.      The parties may submit motions and memoranda no later than December 20,

2013, on the issue of whether the Court's order of August 13, 2012, granting

summary judgment as to the declaratory judgment count should be vacated.

3.      Defendant's motion to strike the interrogatory answers is DENIED.


**So Ordered.**


                                           /s/  F. Dennis Saylor
                                           F. Dennis Saylor IV
                                           United States District Judge
Dated: November 27, 2013