# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

METSO AUTOMATION USA, INC., )
)
**Plaintiff,** )
)   **Civil Action No.**
v. )   **11-10514-FDS**
)
ITT CORPORATION, )
)
**Defendant.** )
_____)

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO VACATE AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a dispute concerning an indemnification agreement. Jurisdiction is based on diversity of citizenship. Plaintiff Metso Automation USA, Inc. and defendant ITT Corporation each seek contractual indemnification from the other for damages incurred defending asbestos-related product-liability suits. The parties both rely on an indemnity clause contained in an agreement executed in 1983 between their predecessors-in-interest.

The complaint originally stated a claim for, among other things, declaratory judgment as to the parties' rights under the 1983 Agreement. On August 13, 2012, the Court dismissed Metso's declaratory judgment claim on the ground that it was duplicative of the other substantive claims in the complaint. Metso has moved to vacate the Court's previous ruling on the declaratory judgment claim and enter declaratory judgment interpreting the 1983 Agreement in general terms. ITT opposes vacating the Court's previous ruling and has moved for summary judgment on the contractual indemnification claims.

For the following reasons, the motions will be granted in part and denied in part.

## I.    Background

### A.    Factual Background

The following facts are undisputed unless otherwise noted.

#### 1.    The 1983 Agreement

ITT is an Indiana corporation with a principal place of business in White Plains, New York.  (Docket No. 1 ¶ 3).[1]  Metso Automation USA, Inc. is a Delaware corporation with a principal place of business in Shrewsbury, Massachusetts.  (*Id.*).

ITT is the successor-in-interest to ITT-Grinnell Valve Co., Inc.  (Docket No. 66 ¶ 1).  From 1958 to 1984, ITT-Grinnell manufactured valves under the name "Hammel Dahl."  (*Id.*).  At least some of those valves may have contained asbestos.

Pursuant to an agreement dated December 15, 1983 (the "1983 Agreement"), ITT-Grinnell sold its Hammel Dahl assets to Hammel Dahl, Inc., a Rhode Island corporation.  (*Id.* ¶ 2).  The transaction closed on January 26, 1984.  (*Id.*).

Article IV of the 1983 Agreement apportioned liability between Hammel Dahl and ITT-Grinnell for product-liability claims.  (*Id.* ¶ 3).  Specifically, § 4.1 states in relevant part:

> The Purchaser shall, by an instrument to be executed and delivered at the Closing . . . agree to perform, pay or discharge, to the extent not theretofore performed, paid or discharged, the following liabilities and obligations of the Seller:
>
> . . .
>
> (c) Liabilities of the Seller on account of any product liability claim with respect to products of the Division shipped after the Closing Date, provided, however, that all products, regardless of their actual date of shipment, shall be presumed to have been shipped after the Closing Date unless the Purchaser can show that a particular product was shipped prior to the Closing Date . . . .  The Purchaser further agrees

---

[1] Because of the extensive record in this case, all citations will be to the docket.

that, upon request of the Seller, the Purchaser will fully cooperate with and assist the Seller in defending any product liability claims that may be brought against Seller, provided, however, that the Seller shall reimburse the Purchaser for any expenses (including salaries and travel expenses of its employees) incurred by the Purchaser in providing such assistance.

Except as expressly provided in this Section 4.1, the Purchaser shall not be obligated to assume or become liable for any of the Seller's liabilities, obligations, debts, contracts or other commitments of any kind whatsoever, known or unknown, fixed or contingent.

(Docket No. 66, Ex. 1). Sections 4.2 and 4.3 defined the parties' indemnification rights under

the agreement. Section 4.2 states in relevant part:

The Seller shall indemnify the Purchaser against and hold it harmless from any and all liabilities in respect of suits, proceedings, demands, judgments, damages, expenses and costs (including, without limitation, reasonable counsel fees) which the Purchaser may suffer or incur by reason of (i) the Seller's failure to pay, discharge or perform any of its liabilities or obligations which are not expressly assumed by the Purchaser under this Agreement . . . .

(*Id.*). Section 4.3 states:

The Purchaser shall indemnify the Seller against and hold it harmless from any and all liabilities in respect of suits, proceedings, demands, judgments, damages, expenses and costs (including, without limitation, reasonable counsel fees) which the Seller may suffer or incur by reason of (i) the Purchaser's failure to pay, discharge or perform any of its liabilities or obligations which are expressly assumed by the Purchaser under this Agreement; and (ii) breaches of or inaccuracies in the covenants, representations and warranties made by the Purchaser in this Agreement.

(*Id.*). The 1983 Agreement is governed by Rhode Island law. (*Id.* § 16.10).

Metso is Hammel Dahl, Inc.'s successor-in-interest under the agreement. (Docket No. 66

¶ 6). In 2002, Metso sold all Hammel Dahl assets to Koso America, Inc. As part of that sale,

Metso agreed to indemnify Koso for product-liability claims.

## 2. **Product-Liability Lawsuits Against Koso**

Metso has defended ten lawsuits filed against Koso alleging injury from Hammel Dahl valves (the "Metso actions"). (Docket No. 66 ¶ 7). Those cases are as follows:

(1) *Andrew et al. v. Alco Div. of Nitram Energy Inc., et al.*, No. 10-L-538 (Ill. Cir. Ct.);

(2) *Dombrowski, et al. v. Alfa Laval, Inc., et al.*, No. 08-1938 (Mass. Super. Ct.);

(3) *Horsham, et al. v. A.O. Smith, et. al*, No. 113364/2006 (N.Y. Sup. Ct.);

(4) *Range, et al. v. Owens Illinois, Inc., et al.*, No. 100702378 (Pa. Ct. Com. Pl.);

(5) *Sether, et al. v. AGCO Corp., et al.*, No. 07-L-865 (Ill. Cir. Ct.);

(6) *Stephenson v. Asbestos Defendants, et al.*, No. 07-274108 (Cal. Super. Ct.);

(7) *Carmine, et al. v. 4520 Corp., Inc., et al.*, No. N10C-10-281 (Del. Super. Ct.);

(8) *Sumner, et al. v. American Blower Co., et al.*, Noo. N11C-04-024 (Del. Super. Ct.);

(9) *Mahar, et al. v. Allied-Chalmers Corp. Prod. Liab. Trust, et al.*, No. 07-274434 (Cal. Super. Ct.); and

(10) *Bludworth, et al. v. Anderson Brooksbank Valves USA LLC, et al.*, No. 09-06722 (Tex. Dist. Ct.).

(*Id.* ¶ 7; Docket No. 18 ¶ 1; Docket No. 44 ¶ 8).

All of those actions, save *Carmine* and *Bludworth*, have been dismissed. (Docket No. 66 ¶ 8).[2] Metso has not paid any settlement or judgment as a result of those cases. (*Id.* ¶ 9).

---

[2] It is not clear whether the *Carmine* or *Bludworth* actions are still pending. ITT's request for docket information from *Carmine* is still pending with the Delaware Superior Court. (Docket No. 66, Ex. 3 ¶ 4). *Bludworth* has not been mentioned by either party in the pleadings for the motions that are the subject of this memorandum and order.

### a. *Andrew*

The complaint in *Andrew* was filed on May 18, 2010, against Koso and a number of other defendants.  (Docket No. 78, Ex. 42).  The complaint alleged that the plaintiff was exposed to asbestos while serving in the U.S. Navy from 1944 to 1946 and working as a farmer in Texas from the 1940s to the 1980s.  (*Id.* ¶ 4).  According to an affidavit submitted by former counsel for Metso and a predecessor, no Hammel Dahl valves were sold for use by farmers since at least the 1983 Agreement.  (Docket No. 78, Ex. 24 ¶ 14).

### b. *Dombrowski*

The complaint in *Dombrowski* was filed on May 16, 2008, against Koso and a number of other defendants.  (Docket No. 78, Ex. 43).  The complaint alleged that the plaintiff was exposed to asbestos while serving in the U.S. Navy from 1960 to 1964.  (*Id.* ¶ 9).

### c. *Horsham*

The complaint in *Horsham* was filed on September 18, 2006, against Koso and a number of other defendants.  (Docket No. 78, Ex. 44A).  At his deposition, the plaintiff in that case testified that he was exposed to asbestos in the 1950s and 1960s.  (Docket No. 78, Ex. 44 at 58-62, 88).

### d. *Range*

The complaint in *Range* was filed on July 22, 2010, against Koso and a number of other defendants.  (Docket No. 78, Ex. 46A).  At his deposition, the plaintiff in that case testified that he was exposed to asbestos while serving in the U.S. Navy from 1962 to 1968.  (Docket No. 78, Ex. 46 at 7, 69-72).

### e. *Sether*

The complaint in *Sether* was filed on April 20, 2009, against Koso and a number of other defendants.  (Docket No. 78, Ex. 47).  The complaint alleged that the plaintiff was exposed to asbestos while serving in the U.S. Navy from 1942 to 1962 and while working at the Electric Boat Company from 1962 to 1985.  (*Id.* ¶¶ 1, 3).  According to Metso, the Electric Boat Company did not use asbestos in its products after 1981.  (Docket No. 78 ¶ 82).

### f. *Stephenson*

Metso has withdrawn its claim for indemnification in *Stephenson*.  (Docket No. 77 ¶ 7).

### g. *Carmine*

The complaint in *Carmine* was filed on March 24, 2011, against Koso and a number of other defendants.  (Docket No. 78, Ex. 48).  The complaint alleged that the plaintiff was exposed to asbestos while employed as a laborer, machinist, or other worker from 1941 to 1982.  (*Id.* ¶ 4).

### h. *Sumner*

The complaint in *Sumner* was filed on April 4, 2011, against Koso and a number of other defendants.  (Docket No. 78, Ex. 49).  That complaint alleged that the plaintiff was exposed to asbestos from 1968 to 1973, and at various times during the 1970s.  (*Id.* ¶ 2).

### i. *Mahar*

The complaint in *Mahar* was filed on November 2, 2007, against Koso and a number of other defendants.  (Docket No. 44, Ex. 3, Ex. A).  Responses to interrogatories in that case state that the plaintiff was exposed to asbestos from Hammel Dahl products from 1961 to 1964. (Docket No. 51, Ex. 1 ¶¶ 9-12).

### j.    *Bludworth*

The complaint in *Bludworth* was filed on May 28, 2009, against Koso and a number of other defendants.  (Docket No. 18, Ex. 1, Ex. A at 2587).  At his deposition, the plaintiff in that case testified that he had been exposed to asbestos from Hammel Dahl products in the 1960s and in 1971.  (Docket No. 18, Ex. 1, Ex. B at 2581).

### 3.    Product-Liability Lawsuits Against ITT

ITT has settled nine product-liability lawsuits (the "ITT actions").  (Docket No. 66, Ex. 2 ¶¶ 2, 4-12).  Those cases are as follows:

(1)    *Boggess, et al. v. A. W. Chesterton Co., et al.*, No. 12-C-1050 (W. Va. Cir. Ct.);

(2)    *Estate of Brown v. 3M Co., et al.*, No., 09-C-1376 (W. Va. Cir. Ct.);

(3)    *Chancey, et al. v. 3M Co., et al.*, No. 10-C-879 (W. Va. Cir. Ct.);

(4)    *Edwards, et al. v. A. W. Chesterton Co., et al.*, No. 10-C-1996 (W. Va. Cir. Ct.);

(5)    *Fischerkeller, et al. v. 20th Century Glove Corp. of Texas, et al.*, No. 11-C-366 (W. Va. Cir. Ct.);

(6)    *Hunt v. 3M Co., et al.*, No. 10-C-878 (W. Va. Cir. Ct.);

(7)    *Oxley, et al. v. 3M Co., et al.*, No. 09-C-2178 (W. Va. Cir. Ct.);

(8)    *Spurlock, et al. v. A. W. Chesterton Co., et al.*, No. 11-C-415 (W. Va. Cir. Ct.); and

(9)    *White, et al. v. A. W. Chesterton Co., et al.*, No. 12-C-872 (W Va. Cir. Ct.).

(*Id.* ¶ 2).

In all of those actions, the plaintiff was allegedly exposed to asbestos from Hammel Dahl valves at the Union Carbide plant in South Charleston, West Virginia; the Union Carbide plant in

Institute, West Virginia; or the Mobay Chemical plant, also apparently in West Virginia. (*See* Docket No. 83, Ex. 1 col. F). Several documents indicate that Hammel Dahl valves may have been used at those facilities. First, a January 2, 1964 design report for an ethanol refining system in the South Charleston plant indicates that Hammel Dahl valves were specified for use in that system, along with valves of two other manufacturers. It is not possible from the document to determine whether Hammel Dahl valves were actually used. (Docket No. 78 ¶ 8; Ex. 3 at 020507-10, 020513, 050516). Second, a 1951 report on the Institute plant indicates that Hammel Dahl valves were one of three types of valves that could have been used in a vent gas recovery system that began operating on June 1, 1950. (Docket No. 78 ¶¶ 26-30; Ex. 10 at 068376, 068379, 068677, 068684, 068688, 068691, 068696, 068747, 068958, 069012). Third, a 1955 document describing piping standards in the Mobay plant contains references to two types of Hammel Dahl valves. (Docket No. 78 ¶ 52; Ex. 28 at 08235-36). Finally, an engineering specification from the 1970s concerning the Mobay plant contains references to Hammel Dahl valves. (Docket No. 78 ¶ 56-57; Ex. 29 at 08239-40).[3] In each instance, it is not possible from the document to determine whether Hammel Dahl were actually used.

### a.    *Boggess*

On August 19, 2013, ITT settled *Boggess*, making a settlement payment of $40,000 in exchange for the release of the plaintiffs' asbestos-related claims. (Docket No. 66, Ex. 2, Ex. A). The plaintiff's alleged exposure to asbestos occurred at the South Charleston plant. (Docket No. 78, Ex. 1, at 9). ITT contends that its liability in the case arose solely from the plaintiff's alleged exposure to Hammel Dahl products. (Docket No. 66, Ex. 2 ¶ 4).

---

[3] Four of the pages of this document are labeled "5/1/73" while one is labeled "7/1/74." (Docket No. 78, Ex. 29 at 082039-43).

### b.    _Brown_

On July 14, 2011, ITT settled _Brown_, making a settlement payment of $20,000 in exchange for the release of the plaintiffs' asbestos-related claims.  (Docket No. 66, Ex. 2, Ex. B). The plaintiff's alleged exposure to asbestos occurred at the Union Carbide South Charleston plant.  (Docket No. 78, Ex. 5 at 11).  ITT contends that one-third of its liability exposure in _Brown_ came from the plaintiff's alleged exposure to Hammel Dahl valves, and it therefore allocated $6,666.66 of the settlement to discharge that liability.  (Docket No. 66, Ex. 2 ¶ 5).

### c.    _Chancey_

On May 2, 2011, ITT settled _Chancey_, making a settlement payment of $25,000 in exchange for the release of the plaintiffs' asbestos-related claims.  (Docket No. 66, Ex. 2, Ex. C). The plaintiff's alleged exposure occurred at the South Charleston and Institute plants.  (Docket No. 78, Ex. 13 at 10).  ITT contends that half of its liability exposure in _Chancey_ came from the plaintiff's alleged exposure to Hammel Dahl valves, and it therefore allocated $12,500 of the settlement to discharge that liability.  (Docket No. 66, Ex. 2 ¶ 6).

### d.    _Edwards_

On March 9, 2012, ITT settled _Edwards_, making a settlement payment of $50,000 in exchange for the release of the plaintiffs' asbestos-related claims.  (Docket No. 66, Ex. 2, Ex. D). The plaintiff's alleged exposure occurred at the South Charleston and Institute plants.  (Docket No. 78, Ex. 19 at 9).  ITT contends that half of its liability exposure in _Edwards_ came from the plaintiff's alleged exposure to Hammel Dahl valves, and it therefore allocated $25,000 of the settlement to discharge that liability.  (Docket No. 66, Ex. 2 ¶ 7).

### e.    _Fischerkeller_

On March 12, 2012, ITT settled *Fischerkeller*, making a settlement payment of $30,000 in exchange for the release of the plaintiffs' asbestos-related claims. (Docket No. 66, Ex. 2, Ex. E). The plaintiff's alleged exposure occurred at the Mobay plant. (Docket No. 78, Ex. 23 at 13). ITT contends that half of its liability exposure in *Fischerkeller* came from the plaintiff's alleged exposure to Hammel Dahl valves, and it therefore allocated $15,000 of the settlement to discharge that liability. (Docket No. 66, Ex. 2 ¶ 8).

### f.    *Hunt*

On March 12, 2012, ITT settled *Hunt*, making a settlement payment of $50,000 in exchange for the release of the plaintiffs' asbestos-related claims. (Docket No. 66, Ex. 2, Ex. F). The plaintiff's alleged exposure occurred at the South Charleston plant. (Docket No. 78, Ex. 31 at 8). ITT contends that half of its liability exposure in *Hunt* came from the plaintiff's alleged exposure to Hammel Dahl valves, and it therefore allocated $25,000 of the settlement to discharge that liability. (Docket No. 66, Ex. 2 ¶ 9).

### g.    *Oxley*

On June 15, 2011, ITT settled *Oxley*, making a settlement payment of $50,000 in exchange for the release of the plaintiffs' asbestos-related claims. (Docket No. 66, Ex. 2, Ex. G). The plaintiff's alleged exposure occurred at the Institute plant. (Docket No. 78, Ex. 35 at 12). ITT contends that its liability in the case arose solely from the plaintiff's alleged exposure to Hammel Dahl products. (Docket No. 66, Ex. 2 ¶ 10).

### h.    *Spurlock*

On March 21, 2012, ITT settled *Spurlock*, making a settlement payment of $40,000 in exchange for the release of the plaintiffs' asbestos-related claims. (Docket No. 66, Ex. 2, Ex. H).

The plaintiff's alleged exposure occurred at the South Charleston plant. (Docket No. 78, Ex. 38 at 9). ITT contends that its liability in the case arose solely from the plaintiff's alleged exposure to Hammel Dahl products. (Docket No. 66, Ex. 2 ¶ 11).

### i. *White*

On May 3, 2013, ITT settled *White*, making a settlement payment of $20,000 in exchange for the release of the plaintiffs' asbestos-related claims. (Docket No. 66, Ex. 2, Ex. I). The plaintiff's alleged exposure occurred at the Institute plant. (Docket No. 78, Ex. 41 at 10). ITT contends that its liability in the case arose solely from the plaintiff's alleged exposure to Hammel Dahl products. (Docket No. 66, Ex. 2 ¶ 12).

## B. Procedural Background

### 1. Complaint and Counterclaim

On December 31, 2010, the complaint in this case was filed in Worcester Superior Court. It alleged claims against ITT for breach of contract, common-law indemnity, declaratory judgment, and violations of Chapter 93A. On March 25, 2011, ITT removed the case to this Court. On January 19, 2012, ITT asserted a counterclaim against Metso for breach of contract.

On August 14, 2012, the Court dismissed Metso's claims for common-law indemnity, declaratory judgment, and violations of Chapter 93A. The declaratory-judgment claim was dismissed on the grounds that it was duplicative of the other substantive claims in the complaint.

### 2. Motion for Partial Summary Judgment

On April 5, 2013, ITT moved for partial summary judgment on four "exemplar" actions. The four actions typify four categories of cases in which the parties dispute their respective indemnification obligations. Those categories, as presented by ITT, are:

(1) *"Mahar"* cases: cases in which Metso seeks indemnification by ITT, and the complaint in the underlying product liability case alleges exposure that extends beyond the closing date;

(2) "*Sumner*" cases: cases in which Metso seeks indemnification by ITT, and the complaint in the underlying product liability case alleges exposure that ended before the closing date;

(3) "*Moore*" cases: cases in which ITT seeks indemnification by Metso, and the complaint in the underlying product liability case alleges exposure that extends beyond the closing date; and

(4) "*Livingston*" cases: cases in which ITT seeks indemnification by Metso, and the complaint in the underlying product liability case alleges exposure that ended before the closing date.

*Metso Automation USA, Inc. v. ITT Corp.*, 2013 WL 6210649, at *3 (D. Mass. Nov. 27, 2013).

On November 27, 2013, the Court issued a memorandum and order on ITT's motion for partial summary judgment. In lieu of granting the motion as to the *Sumner*, *Moore*, and *Livingston* cases, and denying the motion as to the *Mahar* case, the Court allowed Metso the opportunity to file a Rule 56(d) response to establish that further factual development was necessary and appropriate in the unique circumstances of this case. *See* Fed. R. Civ. P. 56(d). The Court also gave the opportunity for the parties to brief the issue of whether the Court's order of August 13, 2012, dismissing the declaratory-judgment count should be vacated.

On December 20, 2013, the parties filed briefs on the declaratory-judgment issue. Metso requested that the Court (1) vacate the order dismissing the declaratory-judgment count, (2) dismiss without prejudice its claims and ITT's counterclaims for breach of contract on the individual product-liability claims, and (3) enter a summary judgment on the declaratory-judgment count interpreting the 1983 Agreement in general terms. Metso contends that discovery and trial will entail significant effort because it will need to investigate, among other

things, (1) the quantum and quality of ITT's defense costs, (2) whether defense costs or settlement payments attributed to it are reasonable and proper, and (3) whether insurance factors into particular indemnification claims. Metso did not file a Rule 56(d) response in its December 20 briefing.

ITT requested that the Court not vacate its earlier order and proceed to handle the individual claims in this case at summary judgment or trial as would ordinarily occur. It contends that reinstating the declaratory-judgment claim would create an improper opportunity for interlocutory appeal that may result in piecemeal litigation.

### 3.    Motion for Summary Judgment

On March 7, 2014, ITT filed a motion for summary judgment, seeking only to press its indemnification claims in the lawsuits described above. ITT contends it is entitled to summary judgment in the nine ITT actions that have settled and all ten of the Metso actions.[4]

On March 13, 2014, this Court denied without prejudice ITT's April 5, 2013 motion for partial summary judgment because it appeared to be superseded by ITT's new motion for summary judgment.

On March 17, 2014, Metso filed a motion to stay or defer ITT's motion for summary judgment, pending the Court's ruling on Metso's earlier motion to vacate judgment on its declaratory-judgment claim. Metso also requested, under Rule 56(d), that the Court defer its consideration of ITT's summary judgment motion.

On May 5, 2014, Metso filed an opposition to ITT's motion for summary judgment. On June 10, ITT filed a reply to Metso's opposition. ITT also filed, among other things, affidavits

---

[4] Because Metso has dropped its indemnification action in *Stephenson*, only nine of the ten Metso actions remain.

from Patrick Moyer, Craig Johnson, and Matthew Iverson in support of its reply brief.

On July 14, Metso filed a motion to strike the affidavits filed with ITT's reply brief. It contends that the Moyer affidavit, Johnson affidavit, and paragraphs five through seven of the Iverson affidavit should be struck because all three affidavits contain improper new evidentiary material in support of the motion for summary judgment and the Moyer and Johnson affidavits do not meet the requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure.[5]

## II.      Motion to Vacate Dismissal of Declaratory-Judgment Claim

Metso contends that (1) the Court's earlier order dismissing the declaratory judgment claim should be vacated, (2) a separate and final declaratory judgment interpreting the 1983 Agreement should be entered, and (3) the various individual claims should be dismissed without prejudice. It contends that doing so will simplify the litigation, reduce costs, and bring this matter to a speedier resolution.

In its amended complaint, Metso made specific allegations of breach of contract based on the ten underlying asbestos claims at issue. It also sought a declaration that defendant "is obligated to indemnify Metso against and hold it harmless from the Asbestos Claims and future claims for which ITT remains liable under the 1983 Agreement." (Am. Compl. ¶¶ 17, 25). On August 14, 2012, the Court issued an order dismissing the claim for declaratory relief as essentially duplicative of its breach-of-contract claims.

Metso contends the dismissal of the declaratory-judgment claim should be vacated, and summary judgment on the declaratory-judgment claim should be entered, in order to facilitate a

---

[5] Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

prompt appeal of that decision. Metso notes that the resolution of the entire matter essentially turns on the Court's interpretation of the 1983 Agreement, and points to the significant efforts that would be necessary to take discovery and bring its ten individual claims to trial.

Although Metso's argument has some substantial merit, and the Court has considered the issue at some length, ultimately it will decline to follow that path. First, Metso's claims are not the only ones at issue in this case. ITT has asserted counterclaims that the Court cannot simply dismiss over ITT's objection. Metso suggests this court could stay Metso's and ITT's claims, enter a declaratory judgment, and certify the matter for an interlocutory appeal under 28 U.S.C. § 1292(b). But such interlocutory appeals are normally reserved for highly unusual circumstances, and doing so is likely to introduce additional delays and may result in piecemeal litigation. Furthermore, and contrary to Metso's contention, staying the substantive claims will not save the parties from undertaking further significant discovery efforts. To the contrary, the parties in this case completed discovery on April 5, 2013. And while it is true that there may be a need to proceed to trial on some factual issues, it does not appear that any such trial would be difficult or complex; indeed, such a trial is likely to require a handful of days at most. Finally, even if a substantial effort were necessary to prepare a case for summary judgment and trial, that is not a "danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Sullivan v. Bankhead Enters., Inc.*, 108 F.R.D. 378, 381 (D. Mass. 1985) (quoting *Campbell v. Westmoreland Farm, Inc.*, 403 F.2d 939, 942 (2d Cir. 1968)).

Accordingly, Metso's motion to vacate the order dismissing the claim for a declaratory judgment will be denied, and the Court will not enter separate and final judgment as to that

claim. That denial is without prejudice.[6]  Because the Court has resolved Metso's motion to vacate, the Court will deny Metso's motion to stay or defer consideration of ITT's motion for summary judgment as moot.

## III.    ITT's Motion for Summary Judgment

ITT has moved for summary judgment on the indemnity claims in the remaining Metso and ITT actions.  The remaining Metso actions are *Andrew*, *Dombrowski*, *Horsham*, *Range*, *Sether*, *Carmine*, *Bludworth*, *Mahar*, and *Sumner*.[7]  The remaining ITT cases are *Boggess*, *Brown*, *Chancey*, *Edwards*, *Fischerkeller*, *Hunt*, *Oxley*, *Spurlock*, and *White*.

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v.*

---

[6] It remains unclear how the declaratory judgment claim presents any additional issues that would not be resolved when the contract claim is resolved.  If Metso is able to demonstrate to the Court that the declaratory judgment claim presents different issues or facts from the substantive claims for indemnification, the Court is prepared to reconsider the decision to deny Metso's motion to vacate.

[7] Metso has withdrawn its claim for indemnification in *Stephenson*.

*Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading, "but instead must "present affirmative evidence." *Id.* at 256-57.

### A.     <u>Metso Actions</u>

ITT contends that it is entitled to summary judgment on the indemnity claims arising out of the nine remaining Metso actions because the 1983 Agreement does not require it to pay for Metso's defense costs for lawsuits that do not end in a settlement or judgment against Metso. In the alternative, ITT contends that it is entitled to summary judgment on the indemnity claims in seven of the nine remaining Metso actions because Metso has not met its contractual burden to show that any Hammel Dahl products in those cases were shipped prior to the 1983 Agreements's closing date.

### 1.     <u>Duty to Defend</u>

The 1983 Agreement is governed by Rhode Island law. (Docket No. 66, Ex. 1 § 16.10). Under Rhode Island law, a court's primary task in interpreting a contract is to "ascertain the intent of the parties." *D.T.P., Inc. v. Red Bridge Props., Inc.*, 576 A.2d 1377, 1381 (R.I. 1990). Where possible, the parties' intentions should be inferred from the terms of the contract, giving those terms "their plain, ordinary, and usual meaning." *Johnson v. Western Nat'l Life Ins. Co.*, 641 A.2d 47, 48 (R.I. 1994) (citing *Sentry Ins. Co. v. Grenga*, 556 A.2d 998, 999 (R.I. 1989)). "[I]ndemnity provisions are valid if sufficiently specific, but are to be 'strictly construed against the party alleging a contractual right of indemnification.'" *Sansone v. Morton Mach. Works,*

*Inc.*, 957 A.2d 386, 393 (R.I. 2008) (quoting *Muldowney v. Weatherkind Prods., Inc.*, 509 A.2d 441, 443 (R.I. 1986)).

As noted, Section 4.2 of the 1983 Agreement states, in relevant part, that ITT

> shall indemnify [Metso] against and hold it harmless from any and all liabilities in respect of suits, proceedings, demands, judgments, damages, expenses, and costs (including, without limitation, reasonable counsel fees) which [Metso] may suffer or incur by reason of [ITT's] failure to pay, discharge or perform any of its liabilities or obligations which are not expressly assumed by [Metso] under this Agreement . . . .

(Docket No. 66, Ex. 1). Therefore, the first question is whether Metso's defense costs in the Metso actions are "liabilities or obligations which are not expressly assumed by [Metso]" under the 1983 Agreement. (*Id.*).

Metso contends that because the indemnification obligation includes "expenses[] and costs (including, without limitation, reasonable counsel fees)," its defense costs are covered by the indemnification provision. Put another way, Metso contends that ITT was responsible for defending Metso in the Metso actions because indemnification for "expenses and costs . . . including . . . counsel fees" necessarily implies a duty to defend.

ITT contends that the indemnification provision does not apply to all of Metso's defense costs—only those that were incurred because of ITT's failure to pay, discharge, or perform any of its liabilities or obligations. It contends that because the agreement does not include a specific duty to defend Metso from product-liability claims, it is only obliged to indemnify Metso's defense costs if its duty to indemnify has been triggered (for example, if Metso is found liable in a personal injury case arising out of a valve for which ITT bears responsibility under the contract, and ITT refuses to pay).

A duty to defend is separate from a duty to indemnify. *See, e.g.*, *Saint Paul United*

*Methodist Church v. Gulf States Conference Ass'n of Seventh-Day Adventists, Inc.*, 2013 WL

2453719, at \*2 (M.D. Ala. June 5, 2013) (explaining that "the duty to indemnify is separate and

distinct from the duty to defend" (citing 42 C.J.S. Indemnity § 3 (2013 supp.)) .[8]

   That distinction is important because the two duties are different.  The duty to defend

requires that the party with that duty litigate the matter in court, and normally arises if "the

pleadings recite facts bringing the injury complained of within the [contract]."  *Peerless Ins. Co.*

*v. Viegas*, 667 A.2d 785, 787 (R.I. 1995) (internal quotation marks omitted).  The duty to

indemnify, in contrast, requires the indemnitor to pay liabilities incurred by the indemnitee if the

facts of the case give rise to an indemnification obligation under the contract.  See *Travelers*

*Cas. & Sur. Co. v. Providence Washington Ins. Co.*, 685 F.3d 22, 25 (1st Cir. 2012).

   Here, the 1983 Agreement states that ITT shall "indemnify [Metso] against and hold it

harmless from any and all liabilities . . . ."  (Docket No. 66, Ex. 1 § 4.2).  It does not include a

specific duty to defend.  While it is true that the agreement includes indemnification for costs

and reasonable attorneys' fees incurred while defending a lawsuit, that indemnification provision

is only triggered if those costs or attorneys' fees are those "which [Metso] may suffer or incur *by*

---

[8] In Rhode Island, issues arising from the different obligations between the duty to defend and duty to
indemnify have arisen most frequently in insurance cases and general contractor-subcontractor disputes.  The cases
that have addressed the different duties acknowledge that the duties are distinct.  *See, e.g., A.F. Lusi Const., Inc. v.*
*Peerless Ins. Co.*, 847 A.2d 254, 260–261 (R.I. 2004) ("A contractual duty to 'indemnify and hold harmless' is not
the legal equivalent of a duty to procure insurance coverage for that indemnity obligation.").  However, many of the
cases have noted that the duty to defend is broader than the duty to indemnify.  *See, e.g., Mellow v. Medical*
*Malpractice Joint Underwriting Ass'n of Rhode Island*, 567 A.2d 367, 368 (R.I. 1989) (explaining that the "duty to
defend arises when the complaint in the underlying tort action contains facts sufficient to bring the case within the
coverage of the policy, regardless of whether the plaintiffs in the tort action will prevail in the tort action"); *Siebe,*
*Inc. v. Louis M. Gerson Co.*, 74. Mass. App. Ct. 544, 553 (2009) (discussing how the duty to defend "is broader than
the duty to indemnify").  Nonetheless,  the cases that have found that the duty to defend to be broader involve
contracts that explicitly include clauses that provide for one party to "defend, indemnify and hold harmless" the
other party.  *See, e.g., Siebe*, 74 Mass. Ct. at 546.  Here, the contract clause at issue does not explicitly provide
for the "duty to defend," so the issue is not whether the duty to defend is broader, but rather, whether the duty to
defend exists at all.

*reason of [ITT's] failure to pay, discharge or perform any of its liabilities or obligations which are not expressly assumed by [Metso] under this Agreement . . . ."* (*Id.* (emphasis added)).

A duty to defend should not be deemed to arise by implication. Under Rhode Island law, indemnity obligations "can only be created by the clear and unambiguous expression of the parties." *See A & B Const., Inc. v. Atlas Roofing & Skylight Co.*, 867 F. Supp. 100, 107 (D.R.I. 1994). No such clear and unambiguous language exists in this case with respect to the duty to defend. Certainly, the parties could have easily included such a duty in the words of the agreement. *See Berkshire Wilton Partners, LLC v. Bilray Demolition Co.*, 91 A.3d 830, 833 (R.I. 2014) (discussing contract with duty "to indemnify, *defend* and hold harmless [the plaintiff] from all liens, claims, court actions, losses, or damages" (emphasis added)).[9] Furthermore, indemnification agreements are to be strictly construed against the party asserting the right of indemnification. *Sangermano v. Roger Williams Realty Corp.*, 22 A.3d 376, 377 (R.I. 2011).

Here, Metso is seeking indemnification for its defense costs in the Metso actions. None of those actions resulted in a judgment against Metso or a settlement paid by Metso, and ITT has therefore not failed to indemnify Metso for any such judgments or settlements. Accordingly, ITT has no liability for any costs incurred by Metso defending those actions under the 1983

---

[9] The California Supreme Court's ruling in *Crawford v. Weather Shield Mfg., Inc.*, 187 P.3d 424 (Cal. 2008) is distinguishable. In *Crawford*, not only did the contract explicitly include a "duty to defend," but the California Supreme Court also concluded that defense obligations "are deemed included in every indemnity agreement unless the parties indicate otherwise." *Id* at 431. Unlike in Rhode Island, there is a California statute that requires this result. See *id.* Here, there appears to be no statute on point, and the language of the contract does not specifically provide for the "duty to defend." The analysis in *Crawford* is therefore inapposite. Other states that have examined the issue have found that a duty to defend cannot be implied from a contract provision requiring only a duty to indemnify. *See United Methodist Church*, 2013 WL 2453719 at *3, n.3 (collecting cases from several states where in the absence of an express statutory or contractual duty to defend, no such duty is implied from a duty to indemnify).

Agreement.[10]  ITT's March 2014 motion for summary judgment will therefore be granted as to the Metso actions.

### 2.    Metso's Failure to Meet Burden of Proof

Even if the contract did contain a duty to defend, ITT is nonetheless entitled to summary judgment on the indemnity claims in seven of the nine Metso actions because Metso has not met its contractual burden to show that Hammel Dahl products involved in those cases were shipped prior to the closing date of the 1983 Agreements.

As explained in the November 2013 order, the Court found that in order for Metso to be entitled to indemnification from ITT, Metso had to meet a certain level of proof to show that a product was shipped before the closing date.  The Court found that Metso did not have to provide proof that a particular product was shipped, but Metso had to show reasonable proof of an earlier shipment.  Mere proof that a particular plaintiff had made a claim is not normally sufficient, but other types of proof—such as invoices, shipment records, or eyewitness testimony—is necessary.

In its November 2013 order, the Court found that Metso had met its burden of proof with respect to the *Mahar* case, but not with respect to the *Sumner* case.  In addition to *Sumner*, ITT contends that Metso has not met its burden with respect to the *Andrew*, *Dombrowski*, *Horsham*, *Range*, *Sether*, and *Carmine* cases.  In its opposition to ITT's motion for summary judgment, Metso acknowledges that "there is no 'particular Hammel Dahl product' involved" in the underlying actions.  Metso contends that it is impossible to overcome the presumption of a later

---

[10] This means that Metso may wind up defending actions in which ITT, not it, may ultimately bear financial responsibility.  Presumably, however, if ITT wishes to control the litigation, it could simply offer to bear responsibility for the defense.

shipment date because, in fact, no Hammel Dahl product of any kind contributed to the claimant's injuries, and therefore no relevant product was ever shipped. Although it may be impossible for Metso to meet its burden under such circumstances, the parties agreed to such an arrangement, regardless of its potential consequences. The burden to prove that a Hammel Dahl product was shipped prior to the closing date is on Metso. Therefore, the very fact that no Hammel Dahl product was involved in any of the seven cases is itself proof that Metso cannot meet its burden of showing that the claim arises out of any relevant Hammel Dahl product shipped before the 1983 Agreement's closing date. As a result, Metso has not met its burden to prove that Hammel Dahl products were shipped prior to the closing date.

Accordingly, ITT's March 7, 2014 motion for summary judgment will be granted as to the Metso actions.

## B. ITT Actions

ITT has also moved for summary judgment on the nine indemnity claims arising out of the ITT actions: *Boggess*, *Brown*, *Chancey*, *Edwards*, *Fischerkeller*, *Hunt*, *Oxley*, *Spurlock*, and *White*. It contends that Metso has not made a showing that any of the products in those cases were shipped before the closing date of the 1983 Agreement. Metso contends that it has shown that the products in those cases must have been shipped before the closing date of the 1983 Agreement.

Again, the 1983 Agreement states that Metso assumes the

[l]iabilities of [ITT] on account of any product liability claim with respect to products . . . shipped after the Closing Date, provided, however, that all products, regardless of their actual date of shipment, shall be presumed to have been shipped after the Closing Date unless [Metso] can show that a particular product was shipped prior to the Closing Date.

(Docket No. 66, Ex. 1 § 4.1(c)). Pursuant to the Court's November 2013 memorandum and

order, Metso can make that showing by "reasonable proof" of an earlier shipment. *Metso*, 2013

WL 6210649, at \*5. While formal proof that is admissible under the Federal Rules of Evidence

is not required, mere allegations or claims are not enough. *Id.* And pursuant to the Court's

August 2012 memorandum and order, that proof may be specific (for example, the actual invoice

or shipping records of the actual valve) or it might be more general (for example, proof that

valves of a particular design were only manufactured and shipped before the closing date).

(Docket No. 29 at 9).

Metso contends that the documents it has submitted show, in general, that the valves the

plaintiffs in the ITT actions were allegedly exposed to were shipped before the closing date of

the 1983 Agreement. In the *Boggess*, *Brown*, *Chancey*, *Edwards*, *Hunt*, and *Spurlock* cases, the

plaintiff was allegedly exposed to asbestos from Hammel Dahl valves at the Union Carbide Plant

in South Charleston, West Virginia. (*See* Docket No. 83, Ex. 1 col. F). In the *Chancey*,

*Edwards*, *Oxley*, and *White* cases, the plaintiff was allegedly exposed to asbestos from Hammel

Dahl valves at the Union Carbide plant in Institute, West Virginia. (*See id.*). In the

*Fischerkeller* case, the plaintiff was allegedly exposed to asbestos from Hammel Dahl valves at

the Mobay Chemical plant. (*See id.*).

Four documents show that it is likely that the Hammel Dahl valves that allegedly caused

plaintiffs' injuries in the ITT actions were shipped well before the closing date of the 1983

Agreement. First, a January 2, 1964 design report for an ethanol refining system in the South

Charleston plant indicates that Hammel Dahl valves were one kind of valve that could have been

used in that system. (Docket No. 78 ¶ 8; Ex. 3 at 020507-10, 020513, 050516). Second, a 1951

report on the Institute plant indicates that Hammel Dahl valves were one of three types of valves

that could have been used in a vent gas recovery system that began operating on June 1, 1950. (Docket No. 78 ¶¶ 26-30; Ex. 10 at 068376, 068379, 068677, 068684, 068688, 068691, 068696, 068747, 068958, 069012). Third, a 1955 document describing piping standards in the Mobay plant contains references to two types of Hammel Dahl valves. (Docket No. 78 ¶ 52; Ex. 28 at 08235-36). Finally, an engineering specification from the 1970s concerning the Mobay plant contains references to Hammel Dahl valves. (Docket No. 78 ¶ 56-57; Ex. 29 at 08239-40).

Assuming Hammel Dahl valves were installed during the construction of those three plants, and that those valves caused the injury alleged by the plaintiffs in the ITT actions, any such valve must have been manufactured and shipped, at the latest, in the 1970s. That would have been prior to January 26, 1984, the closing date of the 1983 Agreement. Metso has therefore been able to "show" to the degree necessary to survive a motion for summary judgment that the valves that plaintiffs in the ITT actions were allegedly exposed to before 1984 were shipped before the closing date of the 1983 Agreement.

ITT contends that those documents do not conclusively show that any Hammel Dahl valves that allegedly injured the plaintiffs in the ITT actions were shipped before the closing date. However, at this stage, Metso does not have to show conclusively that the Hammel Dahl valves were shipped before the closing date. Rather, Metso merely has to provide enough "reasonable proof" to create a genuine issue of material fact. Although ITT has submitted an affidavit from Patrick Moyer that proposes that valves wear over time and need to be replaced, this at best casts doubt on the likelihood that any Hammel Dahl valves that allegedly caused plaintiffs' injuries in the ITT actions were shipped well before the closing date of the 1983

Agreement.[11]  There remains a genuine issue of material fact as to when the valves were shipped. That issue is for the finder of fact to decide.[12]

Accordingly, ITT's March 7, 2014 motion for summary judgment will be denied as to the claim for indemnification in the ITT cases.

## IV.  Conclusion

For the foregoing reasons:

1.    Metso's motion to vacate (Docket No. 58) is DENIED;

2.    ITT's motion for summary judgment (Docket No. 64) is GRANTED as to the Metso actions (*Andrew*, *Dombrowski*, *Horsham*, *Range*, *Sether*, *Carmine*, *Bludworth*, *Mahar*, and *Sumner*) and DENIED as to the ITT actions (*Boggess*, *Brown*, *Chancey*, *Edwards*, *Fischerkeller*, *Hunt*, *Oxley*, *Spurlock*, and *White*).

3.    Metso's motion to stay or defer (Docket No. 68) is DENIED as moot.

4.    Metso's motion to strike (Docket No. 84) is DENIED as moot.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: September 22, 2014                    United States District Judge

---

[11] Metso has moved to strike some of the evidence ITT filed with its reply brief, including the Moyer affidavit.  Metso contends that the Moyer affidavit, Johnson affidavit, and paragraphs five through seven of the Iverson affidavit should be struck because all three affidavits contain improper new evidentiary material in support of the motion for summary judgment.  Specifically, Metso argues that moving parties are not permitted to file reply affidavits.  In addition, Metso contends that the Moyer and Johnson affidavits do not meet the requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure.  With respect to the Moyer affidavit, Metso argues that the declarant does not possess personal knowledge concerning the useful life of Hammel Dahl valves.  Because this Court finds for Metso with respect to ITT's motion for summary judgment on the ITT actions, the Moyer, Johnson, and Iverson affidavits do not affect the Court's analysis or decision.  Therefore, the Court denies the motion to strike these affidavits as moot.

[12] The Court does not decide whether ITT has met any other requirements for indemnification under the 1983 Agreement, or whether further discovery is necessary to evaluate the those requirements.